STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DIVISION OF PUBLIC WELFARE, PLAINTIFF, v. COUNTY OF HUDSON, DEPARTMENT OF HEALTH AND SOCIAL SERVICES: BOARD OF CHOSEN FREEHOLDERS, COUNTY OF HUDSON: EDWARD CLARK, COUNTY EXECUTIVE; WILLIAM JONES, DIRECTOR, HUDSON COUNTY DEPARTMENT OF HEALTH AND SOCIAL SERVICES; JAMES YOUNG, CHIEF, DIVISION OF WELFARE, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, COUNCIL NO. 52, LOCAL 2306; MILTON FILKER, PRESIDENT, LOCAL 2306; MICHAEL LANNI, EXECUTIVE DIRECTOR, COUNCIL 52, RICHARD GOLLIN, VICE PRESIDENT, LOCAL 2306, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided June 15, 1978.

Mr. *Richard M. Hluchan,* Deputy Attorney General, argued the cause for plaintiff (Mr. *William F. Hyland,* Attorney General of New Jersey, attorney).

Mr. *Harold J. Ruvoldt, Jr.,* Hudson County Counsel. argued the cause for the County defendants (Mr. *Charles M. Schimenti,* Assistant Hudson County Counsel, on the brief).

*Mr. Sanford R. Oxfeld* argued the cause for the Union defendants (*Messrs. Rothbard, Harris & Oxfeld,* attorneys).

## Introduction

KENTZ, J. S. C. This case presents another chapter in the legal evolution of the Optional County Charter Law (Charter Law) enacted in 1972. *L.* 1972, *c.* 154, as amended by *L.* 1974, *c.* 141, and *L.* 1975, *c.* 84 (codified at *N. J. S. A.* 40:41A-1 to 144 (Supp. 1977-1978) ). Only two years ago this court was presented with the question of whether a county could, pursuant to the Charter Law, abolish the autonomous Hudson County Welfare Board which was mandated by *N. J. S. A.* 44:7-7, in favor of a proposed department consolidating various services, among them welfare. In *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd.,* 141 *N. J. Super.* 25, 27, 35-36 (Ch. Div. 1976), I held that the Charter Law superseded *N. J. S. A.* 44:7-7 insofar as the latter required an autonomous county welfare board, and therefore the county had the power to consolidate the existing county welfare board with other county functions.

## Facts

Defendant in this action, the County of Hudson (county), thereafter negotiated and executed a collective bargaining agreement with the American Federation of State, County and Municipal Employees, Council No. 52, Local 2306. This agreement contains the terms of employment of county welfare workers. However, it was never submitted to plaintiff New Jersey Department of Human Services, Division of Public Welfare (Division) for its approval. In particular, this agreement set forth salary ranges for the Hudson County welfare employees which were not in compliance with the commonly known Ruling 11, an employment compensation and classification regulation promulgated by the Division

pursuant to *N. J. S. A.* 44:7–6 and governing salary ranges of county welfare board employees.

The present conflict between the county and the Division arose out of differing interpretation of the applicability of Ruling 11 to counties which had abolished the county welfare board. Both parties agree that there exists no material issue of fact and each has moved for summary judgment. The issue presented is whether Ruling 11 remains binding upon the county after its adoption of the executive plan of government pursuant to the Charter Law and its abolition of the county welfare board.

## History

The relevant history behind the promulgation of Ruling 11 has both federal and state legislative components. The Federal Government, through the Social Security Act of 1935, 42 *U. S. C. A.* § 301 *et seq.* (1974 and Supp. 1977), established a series of categorical assistance programs,[1] in order to provide funding for certain classes of needy individuals and families. See *Ariz. State Dept. of Pub. Welf. v. Dept. of Health, Educ. & Welf.*, 449 *F.* 2d 456, 460 (9 Cir. 1971), *cert.* den. 405 *U. S.* 919, 92 *S. Ct.* 945, 30 *L. Ed.* 2d 789 (1972); *X v. McCorkle,* 333 *F. Supp.* 1109, 1113 (D. N. J. 1970) (three-judge court), aff'd as modified *per curiam sub nom., Engelman v. Amos,* 404 *U. S.* 23, 92 *S. Ct.* 181, 30 *L. Ed.* 2d 143 (1971). Aid to Families with Depen-

---

[1]Categorical assistance must be distinguished from general assistance. The latter "is financed only by state and local governments" while the former "refers to programs supported by grants from the federal government under the Social Security Act to give aid to particular categories of individuals." *Kelly v. Wyman,* 294 *F. Supp.* 893, 896 (S. D. N. Y. 1968) (three-judge court), aff'd *sub nom. Goldberg v. Kelly,* 397 *U. S.* 254, 90 *S. Ct.* 1011. 25 *L. Ed.* 2d 287 (1970). For a detailed discussion of the difference between general public assistance in New Jersey under *N. J. S. A.* 44:8–109 *et seq.* and the categorical aid programs under the remainder of *Title* 44, see *East Orange v. McCorkle,* 99 *N. J. Super.* 36 (App. Div. 1968).

dent Children (AFDC), 42 *U. S. C. A.* §§ 601–644 (1974 and Supp. 1977), is one such program,[2] see *Rosado v. Wyman,* 397 *U. S.* 397, 407–408, 90 *S. Ct.* 1207, 1215, 25 *L. Ed.* 2d 442, 453 (1970), having for its purpose the provision of financial aid to dependent, impoverished children.[3] *Shea v. Vialpando,* 416 *U. S.* 251, 253, 94 *S. Ct.* 1746, 1750, 40 *L. Ed.* 2d 120, 125 (1974); *Boucher v. Minter,* 349 *F. Supp.* 1240, 1244–1245 (D. Mass. 1972); *Bradford v. Juras,* 331 *F. Supp.* 167, 170 (D. Or. 1971) (three-judge court); *State v. Clark,* 58 *N. J.* 72, 85 (1971).

The AFDC program known well as "a scheme of cooperative federalism," *King v. Smith, supra,* 392 *U. S.* at 316, 88 *S. Ct.* at 2133, 20 *L. Ed.* 2d at 1125, is financed largely by the Federal Government on a matching fund basis while it is administered by the individual states. *Shea v. Vialpando, supra,* 416 *U. S.* at 253, 94 *S. Ct.* at 1750, 40 *L. Ed.* 2d at 125; *State v. Clark, supra,* 58 *N. J.* at 89; *Marlin v. McCorkle,* 117 *N. J. Super.* 465, 469 (App. Div. 1971). State participation in AFDC is optional. *Redding v. Bur-*

---

[2] Other important programs included Old Age Assistance, 42 *U. S. C. A.* §§ 301–306, Aid to the Blind, 42 *U. S. C. A.* §§ 1201–1206, and Aid to the Permanently and Totally Disabled, 42 *U. S. C. A.* §§ 1351–1355. See *X v. McCorkle, supra,* 333 *F. Supp.* at 1113 n. 7. However, the Supplemental Security Income Program (SSI), 45 *U. S. C. A.* § 1381 *et seq.* replaced these programs. SSI was implemented in this State through the enactment of *N. J. S. A.* 44:7–85 *et seq.* Thus, as of January 1, 1974 these categorical assistance programs became nonexistent and the county welfare boards were relieved of many of their responsibilities under these programs. See *Schultz v. Kott,* 131 *N. J. Super.* 216, 219 (App. Div. 1974).

[3] For a comprehensive background to AFDC, see *King v. Smith,* 392 *U. S.* 309, 88 *S. Ct.* 2128. 20 *L. Ed.* 2d 1118 (1968); *Jefferson v. Hackney,* 304 *F. Supp.* 1332 (N. D. Tex. 1969) (three-judge court), vacated and remanded 397 *U. S.* 821, 90 *S. Ct.* 1517, 25 *L. Ed.* 2d 807 (1970); *Lampton v. Bonin,* 299 *F. Supp.* 336, 304 *F. Supp.* 1384 (E. D. La. 1969) (three-judge court), vacated and remanded 397 *U. S.* 663, 90 *S. Ct.* 1408, 25 *L. Ed.* 2d 644 (1970); *Williams v. Dandridge,* 297 *F. Supp.* 450 (D. Md. 1968 & 1969) (three-judge court), rev'd 397 *U. S.* 471, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491 (1970).

lington, 65 *N. J.* 439, 442 (1974) ; *Hausman v. Institutions and Agencies Dep't,* 64 *N. J.* 202, 206, *cert.* den. 417 *U. S.* 955, 94 *S. Ct.* 3083, 41 *L. Ed.* 2d 674 (1974). But once a state elects to do so, it must comply with AFDC legislation and the rules and regulations promulgated thereunder. *King v. Smith, supra,* 392 *U. S.* at 317, 88 *S. Ct.* at 2133, 20 *L. Ed.* 2d at 1125; *Cornelius v. Minter,* 395 *F. Supp.* 616, 621–622 (D. Mass. 1974) ("state accepts federal money * * * with the realization that there are 'strings attached' ") ; *Johnson v. Harder,* 383 *F. Supp.* 174, 179 (D. Conn. 1974), aff'd *per curiam,* 512 *F.* 2d 1188 (2 Cir.), *cert.* den. 423 *U. S.* 876, 96 *S. Ct.* 149, 46 *L. Ed.* 2d 109 (1975) ; *Essex Cty. Welf. Bd. v. Institutions & Agencies Dep't,* 139 *N. J. Super.* 191, 196 (App. Div. 1976). Withdrawal of federal funds may result from a failure subsequently to follow the applicable federal laws. *Rosado v. Wyman, supra,* 397 *U. S.* at 420, 90 *S. Ct.* at 1232, 25 *L. Ed.* 2d at 460; *Cornelius v. Minter, supra,* 395 *F. Supp.* at 621–622; *Adens v. Sailer,* 312 *F. Supp.* 923, 927 (E. D. Pa. 1970).

One of the main prerequisites to receipt of federal grants-in-aid is the formulation and submission of a state plan for implementing the AFDC program. *Shea v. Vialpando, supra,* 416 *U. S.* at 253, 94 *S. Ct.* at 1750, 40 *L. Ed.* 2d at 125; *Ariz. State Dept. of Pub. Welf. v. Dept. of Health, Educ. & Welf., supra,* 449 *F.* 2d at 460; *Redding v. Burlington Cty. Welf. Bd., supra,* 65 *N. J.* at 442; *Buchanan v. Essex Cty. Welf. Bd.,* 117 *N. J. Super.* 541, 545 (App. Div. 1971). "A 'state plan' consists of all the statutes and regulations which create and provide for the administration of public assistance." *Communications Workers v. Union Cty. Welf. Bd.,* 126 *N. J. Super.* 517, 524 (App. Div. 1974). This plan must also be consistent with the goals and mandates of the federal statutes and regulations. *Shea v. Vialpando, supra,* 416 *U. S.* at 253, 94 *S. Ct.* at 1750, 40 *L. Ed.* 2d at 125; *Mothers & Childrens Rights Org., Inc. v. Stanton,* 371 *F. Supp.* 298, 303 (D. Ind. 1973) ; *Redding*

*v. Burlington Cty. Welf. Bd., supra,* 65 *N. J.* at 442. Of particular import are the requirements that (1) a single state agency administer or supervise the administration of the plan, 45 *C. F. R.* 205.100(a) (i); *Essex Cty. Welf. Bd. v. Institutions & Agencies Dep't, supra,* 139 *N. J. Super.* at 196; *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 524; (2) the plan set up a merit system of personnel administration for state employees, 42 *U. S. C. A.* § 602(a) (5) (A); 45 *C. F. R.* 70.1 *et seq.;* accord, *Norton v. Blayblock,* 285 *F. Supp.* 659, 660, 663 (W. D. Ark. 1968), aff'd *per curiam,* 409 *F.* 2d 772 (8 Cir. 1969); *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 525, and (3) the plan be in effect and mandatory throughout the state, including all political subdivisions. *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 524–525; *Multnomah Cty. v. Luihn,* 180 *Or.* 528, 533, 178 *P.* 2d 159, 162 (Sup. Ct. 1947) ("state-wide administrative plan is mandatory upon the counties and may not be varied by them").

A state may not implement the plan until it is approved by the Department of Health, Education & Welfare (HEW), *Chambers v. Klein,* 419 *F. Supp.* 569, 574–575 (D. N. J. 1976), aff'd mem. 564 *F.* 2d 89 (3 Cir. 1977); *State v. v. Clark, supra,* 58 *N. J.* at 89; *Buchanan v. Essex Cty. Welf. Bd., supra,* 117 *N. J. Super.* at 545, the governmental agency responsible for supervising and administering the Social Security Act. *N. Y. State Dept. of Social Servs. v. Dublino,* 413 *U. S.* 405, 420, 93 *S. Ct.* 2507, 2516, 37 *L. Ed.* 2d 688, 698 (1973). Actual receipt of federal funds is preconditioned upon state certification to HEW that all "the requirements of the state plan have been fulfilled in the administration of the welfare programs." *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 524.

After the state plan is approved, it remains "subject to continuing scrutiny * * * to ensure its continuing conformity to the federally imposed requirements and its continuing freedom from the federally proscribed conditions, both on

the face of the plan and in its administration." *Ariz. State Dept. of Pub. Welf. v. Dept. of Health, Educ. & Welf., supra,* 449 *F.* 2d at 461. If, at a conformity hearing, a state plan or the administration thereof is determined to be no longer in compliance with federal requirements, federal payments to the state are terminated until the defects are cured. *Id.* Where the plan or the state regulations under the plan have been invalidated due to nonconformance, the regulations have been set aside, see *Buchanan v. Essex Cty. Welf. Bd., supra,* 117 *N. J. Super.* at 548, their enforcement has been enjoined, see *X v. McCorkle, supra,* 333 *F. Supp.* at 1109, or the federal funds have been discontinued. *Ariz. State Dept. of Pub. Welf. v. Dept. of Health, Educ. & Welf., supra,* 449 *F.* 2d at 460.

Public assistance in New Jersey is administered through a variety of programs, including categorical assistance such as AFDC. New Jersey, like all other states, elected to participate in AFDC, *L.* 1959, *c.* 86; see *Motyka v. McCorkle,* 58 *N. J.* 165, 168 (1971); *State v. Clark, supra,* 58 *N. J.* at 89. Its state plan was adopted and approved by HEW in 1959. *Redding v. Burlington Cty. Welf. Bd., supra,* 65 *N. J.* at 442; *Motyka v. McCorkle, supra,* 58 *N. J.* at 168.

Under this plan and pursuant to the federal mandate, New Jersey's AFDC program is administered by a single state agency, *viz.,* the Division. See *Essex Cty. Welf. Bd. v. Institutions and Agencies Dept., supra,* 139 *N. J. Super.* at 197; *N. J. A. C.* § 10:91–3.5(c). The Commissioner of the Department of Social Services (Department) is authorized by *N. J. S. A.* 44:10–3 to issue "all necessary rules and regulations and administrative orders * * * to secure for the State of New Jersey the maximum Federal financial participation." *Id.;* accord, *Motyka v. McCorkle, supra,* 58 *N. J.* at 169. Furthermore, the Commissioner is specifically directed to promulgate regulations "[t]o assure that the program shall be in effect in all counties of the State and be mandatory upon them." *N. J. S. A.* 44:10–3(a).

The statute governing AFDC in New Jersey, *N. J. S. A.* 44:10–1 *et seq.*, "is administered in accordance with and governed by the requirements, conditions and procedures similar to those established by [*N. J. S. A.* 44:7–19]." *Essex Cty. Welf. Bd. v. Hellams*, 98 *N. J. Super.* 181, 184 (Cty. Ct. 1967) (quoting from *N. J. S A.* 44:10–2). Accordingly, local administration of the AFDC program is delegated to the county welfare boards pursuant to "*N. J. S. A.* 44:7–12 as applied to the AFDC program through *N. J. S. A.* 44:10–2." *Essex Cty. Welf. Bd. v. Institutions and Agencies Dept., supra,* 139 *N. J. Super.* at 197; see *Redding v. Burlington Cty. Welf. Bd., supra,* 65 *N. J.* at 442; *Buchanan v. Essex Cty. Welf. Bd., supra,* 117 *N. J. Super.* at 543–544. County welfare boards are defined as "the boards established within the several counties for the purposes of administering welfare to the needy, whether set up pursuant to [*N. J. S. A.* 44:7–1 *et seq.*] or pursuant to any other laws of this state." *N. J. S. A.* 44:7–1; see *Buchanan v. Essex Cty. Welf. Bd., supra,* 117 *N. J. Super.* at 543–544.

Administration of AFDC by the county welfare boards is subject to the supervision of the Department which has implemented the state act through administrative regulations pursuant to its authority under *N. J. S. A.* 44:10–3. *Redding v. Burlington Cty. Welf. Bd., supra,* 65 *N. J.* at 442, 445. One such regulation is "Ruling 11, which constitutes the aggregation of provisions controlling the terms and conditions of employment of county welfare board employees." *Essex Cty. Welf. Bd. v. Klein,* 149 *N. J. Super.* 241, 245 (App. Div. 1977). The standard compensation plan set forth in Ruling 11 identifies the various classifications of employers in the state governmental agencies comparable to each position in the county welfare board and applies the same salary ranges to the county position as are applicable to their state counterparts. *Id.* at 245–246; *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 520–521. Both minimum and maximum salaries are set forth for each position. *Id.* at 521.

Ruling 11 was promulgated pursuant to *N. J. S. A.* 44:7–6, which was enacted "in 1936 shortly after the inception of the original Federal Old Age Assistance Program." *Communications Workers v. Union Cty. Bd., supra,* 126 *N. J. Super.* at 526. *N. J. S. A.* 44:7–6 provides in pertinent part:

Said division [of old age assistance] shall, in co-operation and association with the Civil Service Commission, require adequate standards for all county welfare boards, as county bureaus of old age assistance, in the manner following: The division shall by appropriate rule and regulation, establish and maintain standards appropriate to a modern personnel system on a merit basis for all positions and for the application of correct business principles in the creation and abolition of positions, the classification of authorized positions on the basis of the duties and responsibilities of the incumbents, *the development, adoption and the administration of equitable compensation schedules for each class of positions,* the selection, certification, appointment, regulation, and tenure of person holding such positions, and such other standards for a merit system of personnel administration as may lawfully be required by the Federal Social Security Board for approval of a State public assistance plan. * * * *All rules and regulations made by the State division under this chapter shall be binding upon the county welfare boards, as county bureaus of old age assistance.* [Emphasis supplied]

From a reading of this statute and Ruling 11, it is apparent that the State Legislature exercised its option, pursuant to 45 *C. F. R.* 70.8(b), to establish a state-created, statewide plan binding upon the county welfare boards.

The authority of the Department to set and approve salary guidelines for employees of the county welfare board was questioned in *Communication Workers v. Union Cty. Welf. Bd., supra,* which was decided before the adoption of the Charter Law. In that case three county welfare boards entered into collective bargaining agreements which set forth salaries and increments above those required by Ruling 11. *Id.* at 521. The Department did not approve the proposed salary provisions and suits were brought challenging the Department's actions. *Id.* at 521–522. First the court considered the issue of

\* \* \* whether the Legislature, in order to implement the federal assistance programs, either expressly or by necessary implication, granted authorization to the Department of Institutions and Agencies to regulate the salaries of county welfare board employees, that authorization antedating the adoption of the Employer-Employee Relations Act. [at 523–524]

The court reviewed the federal statutes and regulations governing assistance under the various programs of the Social Security Act, in particular 42 *U. S. C. A.* § 302,(a)(5)(A), which prohibits the Secretary of HEW from exercising authority over the compensation of state employees. *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 524–525. Also reviewed were the provisions of the federal regulation promulgated thereunder, 45 *C. F. R.* 70.8. This regulation provides:

(a) A plan of compensation for all classes of positions will be established and maintained on a current basis. *The plan will include salary rates adjusted to the responsibility and difficulty of the work and will take into account the prevailing compensation for comparable positions in the recruiting areas and in other agencies of the government and other relevant factors.* It will provide for salary advancement for full-time permanent employees based upon quality and length of service and other salary adjustments.

(b) *Compensation in a local agency will be governed by a compensation plan which, at the option of the State, is established by:* a local government and covers other local agencies; *the State and covers local grant-aided agencies;* or the State and covers the agency responsible for State administration of Federal grants. [Emphasis supplied]

Despite "the apparent incongruity between the grant of authority contained in the federal statute [42 *U. S. C.* 302(a) (5)(A)] and the directive which purports to implement it [42 *C. F. R.* 70.8(a)]," the court determined that the State has no choice but to comply strictly with the federal regulation or else risk the loss of federal monies. *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 525–526. It was also noted that although a state may under 45 *C. F. R.* 70.8(b) "leave matters of local compensation

to local government control, it has the authority to retain control of the local compensation plans when it so elects." *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 526.

The court then examined *N. J. S. A.* 44:7–6, which implemented the Social Security programs in New Jersey. *Communications Workers v. Union Cty. Welf. Bd., supra,* 126 *N. J. Super.* at 526–527. In considering whether under this statute the State had the right to control salaries at the county level, the court

\* \* \* deem[ed] it significant that *N. J. S. A.* 44:7–6 is not confined to a general grant of authority designed to carry out the federal assistance program, but represents a command to establish and maintain a modern personnel system in this State on a merit basis for all positions, with the classification of such positions on the basis of the duties and responsibilities of the incumbents. [126 *N. J. Super.* at 527]

"A clear intention that this responsibility should include the regulation of salaries of local welfare boards" was evidenced in "the specific directive" mandating that the Commissioner develop and administer "equitable compensation schedules for each class of positions." *Id.* This interpretation was supported not only by the legislative intent but also by the practical application and acceptance of Ruling 11 throughout the State and counties. The court held among other things[4] that

[4]In *Communications Workers,* the court also considered the question of whether the Employer-Employee Relations Act, *N. J. S. A.* 34:13A–1 *et seq.,* superseded Ruling 11 with respect to salary determinations. See 126 *N. J. Super.* at 528. It was held that the county welfare boards were limited in negotiations to the salary ranges prescribed by the Commissioner *id.* at 530, but that the Commissioner was required to conduct a hearing on the reasonableness of the compensation schedules contained in the state plan before the schedules would become effective.

\* \* \* the Commissioner was granted statutory authority to prescribe minimum and maximum salary ranges for county welfare employees and that the power of such boards by virtue of *N. J. S. A.* 44:1-27 and *N. J. S. A.* 44:4-35 to fix and determine the salaries of its officers and employees is subject to the authority granted to the Commissioner. [126 *N. J. Super.* at 528]

## Law

The holding in *Communications Workers* with respect to Ruling 11 must now be considered in light of the Charter Law and judicial constructions thereof. The Charter Law provided the counties with the power to restructure the form of their governments, consistent with the State Constitution and general law, see *Am. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 32, upon the adoption by the county's voters of one of the specified optional forms of government. See generally, *N. J. S. A.* 40:41A-1 to 23.[5]

After the voters have adopted a plan, the county is governed not only by the plan and the Charter Law but also "by all general laws." *N. J. S. A.* 40:41A-25. General law is defined in *N. J. S. A.* 40:41A-26 as

\* \* \* such law or part thereof, heretofore or hereafter enacted, that:
a. Is not inconsistent with this act; and
b. Is by its terms applicable or available to all counties, or;
c. Is applicable to all counties or to any category or class of counties, and deals with one or more of the following subjects: the administration of the judicial system, education, elections, health, county public authorities, taxation, and finance, and welfare.

---

[5]For cases dealing with the procedures for the adoption of an optional form of county government, see *Citizens for Charter Change in Essex Cty. v. Caputo,* 151 *N. J. Super.* 286 (App. Div. 1977); *Citizens for Charter Change in Essex Cty. v. Caputo,* 136 *N. J. Super.* 424 (App. Div. 1975), certif. den. 74 *N. J.* 268 (1975); *Epstein v. Long,* 133 *N. J. Super.* 590 (Law Div. 1975); *Essex Cty. Mayors' Conference v. Bd. of Chosen Freeholders,* 124 *N. J. Super.* 393 (Law Div. 1973).

*N. J. S. A.* 40:41A–26 further specifies that

\* \* \* [n]othing in this act shall be construed to prevent counties from abolishing or consolidating agencies the existence of which has heretofore been mandated by State statute providing that such abolition or consolidation shall not alter the delegation of the county to continue providing the services previously provided by such abolished agency or consolidated agency.

Within this section, the Legislature also set forth the intent behind the Charter Law:

\* \* \* to enable a county that has adopted a charter pursuant to this act to cause any duty that has been mandated to it by the Legislature to be performed in the most efficient and expeditious manner, and, absent a clear legislative declaration to the contrary, without regard to organizational, structural or personnel provisions contained in the legislation mandating such a duty.

A county government under the Charter Law is granted powers which are "as broad as is consistent with the Constitution of New Jersey and with general law relating to local government" and which powers

\* \* \* shall be construed as liberally as possible in regard to the county's right to reorganize its own form of government, to reorganize its structure and to alter or abolish its agencies, subject to the general mandate of performing services, whether they be performed by the agency previously established or by a new agency or another department of county government. [*N. J. S. A.* 40:41A–30]

In particular, the county has the power to

\* \* \* [o]rganize and regulate its internal affairs; create, alter and abolish offices, positions and employments and define the functions, powers and duties thereof; establish qualifications for persons holding offices, positions and employment; and provide for the manner of their appointment and removal and for their term, tenure and compensation. [*N. J. S. A.* 40:41A–27(a)]

The powers of counties which have adopted an optional form of government[6] have been challenged in only five reported decisions. See *In re Salaries for Probation Officers of Hudson Cty.,* 158 *N. J. Super.* 363 (App. Div. 1978); *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra; Mercer Cty. Commun. Coll. Bd. of Trustees v. Sypek,* 151 *N. J. Super.* 1 (Law Div. 1977); *Union Cty. v. State, supra; Union Cty. Park Comm'n v. Union Cty,* 154 *N. J. Super.* 213 (Law Div. 1976), aff'd *o. b.,* 154 *N. J. Super.* 125 (App. Div.), certif. den. 75 *N. J.* 531 (1977).

Four of these decisions dealt with the power of a county to reorganize and consolidate agencies which were statutorily mandated. So long as services continue to be provided, a county under the Charter Law can abolish the county welfare board, see *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 27, 33, 35–36; the county park commission, see *Union Cty. Park Comm'n v. Union Cty., supra,* 154 *N. J. Super.* at 218, 224, 234; the county mosquito extermination commission, see *Union Cty. v. State, supra,* 149 *N. J. Super.* at 401, 404, 413–414; and the board of school estimate, see *Mercer Cty. Commun. Coll. Bd. of Trustees v. Sypek, supra,* 151 *N. J. Super.* at 5, 10, and it can exercise control over the internal affairs of county community colleges and county vocational schools. See *id.* at 4, 10.

More recently the question of control over salaries of certain county employees was raised in the Appellate Division decision of *In re Salaries of Probation Officers of Hudson Cty., supra,* 158 *N. J. Super.* at 365. In that opinion, the court held that "the power of the county court judges to fix the salaries of probation officers * * * remain[ed] unaffected

---

[6] Only four counties have elected to adopt optional forms of government under the Charter Law: Hudson, Mercer, Atlantic and Union. *Union Cty. v. State,* 149 *N. J. Super.* 399, 405 (Law Div. 1977).

by the Optional County Charter Law." *Id.* at 368. The four previously cited cases were distinguished on the ground that court supervision of probation officers has "its basis in constitutional mandate."[7] *Id* at 366.

The issue in the present case is quite different from that decided in *In re Salaries for Probation Officers of Hudson Cty.*, mainly due to the absence of any state constitutional problem with respect to control over employees for the county's Division of Welfare. However, the mandates of the federal law governing financial assistance do pose some interesting but troublesome issues.

## Arguments

The Division argues that federal law governing AFDC programs requires strict adherence to the pertinent federal statutes and regulations. In accordance with 42 *U. S. C. A.* § 602(a) (5) (A) and 45 *C. F. R.* 70.8, the State Legislature enacted *N. J. S. A.* 44:7-6 and pursuant thereto the Commissioner promulgated Ruling 11. Thus, it is maintained that Ruling 11 remains binding as part of the state plan which must be uniform and mandatory upon the state subdivisions.

Secondly, the Division urges that *N. J. S. A.* 44:7-6 and Ruling 11 are "general laws" binding upon the county pursuant to *N. J. S. A.* 40:41A-26 regardless of the abolition of the welfare board. In support of this contention the Division relies on an unreported decision, where the court adjudged and declared, without a formal opinion, that *N. J. S. A.* 44:7-11 is a "general law" within the meaning

---

[7]This appears to be a valid distinction inasmuch as the Charter Law specifies that the county powers are "as broad as is consistent with the Constitution of New Jersey and with general law relating to local government." *N. J. S. A.* 40:41A-30. County control over salaries of probation officers would not be consistent with the state constitutional mandate of court supervision of those officers.

of *N. J. S. A.* 40:41A–26 and is thus binding upon the county pursuant to *N. J. S. A.* 40:41A–25."[8]

Even if the state statute and regulation in question are not considered "general laws," the Division submits that there has been "a clear legislative declaration" contrary to the general principle stated in *N. J. S. A.* 40:41A–26 that county functions are to be performed "without regard to organizational, structural or personnel provisions contained in the [state] legislation." It is the Division's view that such contrary legislative declarations are to be found in *N. J. S. A.* 44:10–3 and in *L.* 1977, *c.* 127, § 2.

Finally, the Division emphasizes that the county in *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 28–29, conceded "that no matter what form the administration of welfare services assumes, [the county] must conform to the requirements, rules and regulations promulgated by [the Department], *including the personnel standards.*" (Emphasis supplied.) It is asserted that the court relied upon this concession in making its determination that the county could abolish the county welfare board, and now the county is bound by that concession.

In response to these arguments the county first notes that further research revealed that the assertions concerning personnel standards which were made by the American Federation of State, County and Municipal Employees were in error for the reasons expressed in the county's argument in the instant case. The main argument which the county now propounds is that *N. J. S. A.* 40:41A–26 supersedes *N. J. S. A.* 44:7–6 and Ruling 11 by virtue of the directive in *N. J. S. A.* 40:41A–26 that prescribed services continue to be performed *"without regard to* organizational, structural or *personnel provisions contained in the legislation mandating*

---

[8]The county did not question the right of the Division to rely on the unpublished *Kabala* opinion but rather addressed the case by arguing that it was distinguishable.

*such a duty."* (Emphasis supplied). Thus, although the county remains bound to provide *Title* 44 services, it does not, in the county's view, need to comply with the personnel provisions in the statute. The legislative history is also used to lend support to this position. In particular, *County Government: Challenge and Change,* 64 (1964) (*Challenge*)[9] is cited for the recommendation that the county should have the administrative power to "se[t] general *personnel* and administrative policies applicable to *all County Agencies."* (Emphasis supplied).

Secondly, the county argues that *N. J. S. A.* 44:7–6 relates only to an autonomous county welfare board and not to the county or any of its political subdivisions. Even though the State's AFDC statute was recently amended, changing the term "county welfare board" to "county welfare agency," this was done, according to the county, to assure that the additional services required by *L.* 1977, *c.* 127, would be performed by a welfare agency set up under the Charter Law as well as by a county welfare board. Nothing in the amendment expressly or impliedly repeals *N. J. S. A.* 40:41A–26. In fact, nothing in the bill concerns personnel provisions. Thus, it is argued that *N. J. S. A.* 44:7–6 remains applicable only to an autonomous county welfare board and, in the absence of "a clear legislative intent to the contrary," is not binding upon its successor agency.

Lastly, the county claims that federal statutory and regulatory directives are adequately covered in the Civil

---

[9]*Challenge* is the published report of the County and Municipal Government Study Commission (Commission) which was established pursuant to *L.* 1966, *c.* 28. *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 30. The purpose of the Commission was to study the functions of municipal and county governments and to make findings and recommendations as to streamlining their structural and administrative functions. *Id.* Although the findings and recommendations of the Commission are "not binding on this court, [they are] to be accorded a good deal of weight." *Id.* at 32.

Service Act and regulations thereunder which allegedly apply to all county welfare boards and their successor agencies. Federal funding would not be jeopardized by the county's noncompliance with Ruling 11 so long as the State Plan was amended to incorporate the changes necessitated by the Charter Law.

## Conclusions

The first issue to be considered is whether *N. J. S. A.* 44:7–6 is considered a "general law" within the meaning of *N. J. S. A.* 40:41A–26. The terms of *N. J. S. A.* 40: 41A–26, as amended by *L.* 1975, *c.* 84, § 8, are "concededly ambiguous."[10] *In re Salaries for Probation Officers of Hudson Cty., supra,* 158 *N. J. Super.* at 367. The Law Division has defined "general law" within this statute to mean

"* * * such law or part thereof, heretofore or hereafter enacted that: (a) Is not inconsistent with this Act; *and* * * * (c) Is applicable to all counties * * *, and deals with * * * : education * * *." [*Mercer Cty. Community College Bd. of Trustees v. Sypek, supra,* 151 *N. J. Super.* at 8 (quoting from *N. J. S. A.* 40:41A–26) ; emphasis in original].

The Appellate Division, by dictum, has construed *N. J. S. A.* 40:41A–26(a)–(c) "to read sections (a) and (b) conjunctively and this conjunctive pair as disjunctive from section (c)." *In re Salaries for Probation Officers of Hudson Cty., supra,* 158 *N. J. Super.* at 367. To the court that construction "seem[ed] a natural distinction where specifically enumerated subjects in section (c) are obviously intended to be preserved." *Id.* at 367.

 Under the dictum of the above case, *N. J. S. A.* 44:7– 6 clearly is a general law within the meaning of *N. J. S. A.*

---

[10]Note that in *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 29 the court dealt with the terms of *N. J. S. A.* 40:41A–26 prior to its amendment.

40:41A–26(c) as it is applicable to all counties and deals with welfare. See *N. J. S. A.* 44:7–6, 44:7–7, 44:10–2. Thus, under *N. J. S. A.* 40:41A–25, 26, the terms of *N. J. S. A.* 44:7–6 and the regulations promulgated thereunder are and remain binding upon counties which have adopted an optional form of government so long as there is not "a clear legislative declaration to the contrary." *N. J. S. A.* 40:41A–26.

The interpretation of "general law" in *Mercer Cty. Commun. Coll. Bd. of Trustees v. Sypek, supra,* 151 *N. J. Super.* at 8, presents another issue: Is *N. J. S. A.* 44:7–6, although applicable to all counties, "not inconsistent" with the Optional County Charter Law? In order to answer this question, the court must follow the general rules of statutory construction with respect to implied repealers. These principles are adequately set forth in *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* where the court stated:

> Repeals by implication are disfavored. In the absence of an express repealer the legislative intent to effect such a repealer must be clear. However, when a subsequent legislative enactment clearly conflicts with an earlier statute affecting the same subject matter the courts will find a legislative intent to supersede the earlier law. The search is for legislative intent. In seeking to discover legislative intent it is to be presumed that the Legislature is aware of all its prior enactments. The new law is to be read in light of the old law and the evils to be remedied. To this end, resort must be had to the history and purpose of the law. If new laws drastically change the old ones, this might be an indication of the legislative intent. [141 *N. J. Super.* at 32; citations omitted]

Furthermore, and of particular importance to this case, state statutes and regulations must be construed consistently with the federal law regarding federal funding programs. See *Townsend v. Swank,* 404 *U. S.* 282, 286, 92 *S. Ct.* 502, 505, 30 *L. Ed.* 2d 448, 453 (1971); *Mothers & Childrens Rights Org., Inc. v. Stanton, supra,* 371 *F. Supp.* at 303; *Burton v. Institutions & Agencies Dept.,* 147 *N. J. Super.* 124, 129 (App. Div. 1977); *Boines v. Lavine,* 44 *A. D.* 2d 765,

766, 354 *N. Y. S.* 2d 252, 254 (App. Div. 1974), *cert.* den. 419 *U. S.* 1040, 95 *S. Ct.* 528, 42 *L. Ed.* 2d 317 (1974).

Applying these general rules, the court must initially make "an analysis of the mandates of Title 44 in light of the subsequent enactment of the act." *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 30; see *N. J. State P. B. A. v. Morristown,* 65 *N. J.* 160, 165 (1974). The major legislative intent behind the Charter Law is adequately set forth in *Mercer Cty. Commun. Coll. Bd. of Trustees v. Sypek, supra,* 151 *N. J. Super.* at 9–11; *Union Cty. Park Comm'n v. Union Cty., supra,* 154 *N. J. Super.* at 223–225, 230–233; and *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* 141 *N. J. Super.* at 30–34. However, certain points which have been stressed by counsel should be noted. County refers to the clear legislative intent set forth in *N. J. S. A.* 40:41A–26 and argues that delivery of welfare services directly by the county without regard to the personnel provisions in *N. J. S. A.* 44:7–6 and Ruling 11 would be more efficient and expeditious. The Legislature, in the county's opinion, not only intended the organizational and structural changes as were permitted in *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* but also intended to permit alterations in the personnel standards. *Challenge, supra,* at XIX, is cited for the following recommendation: "Provide for professional central administration to act under the direction of the elected officials in setting administrative and personnel policies (subject to the protections of Civil Service)." The Commission also pointed out that counties should have the power to "se[t] general personnel and administrative policies applicable to all County Agencies." *Id.* at 64.

While the county is correct in stating that generally it should have control over personnel policies, the Commission itself recognized certain limitations. See *id.* at XIX ("Civil Service"). In particular, the State points out that county initiative would appear limited to those areas which did

not conflict with State and federal prerogative. As authority, *Challenge, supra,* at 99, is cited for the Commission recommendation "that restructured counties eventually be delegated the authority under general law to initiate new services and programs where desirable and where such services and programs *do not conflict with existing* municipal, state and *federal programs* rendered * * *."

I find that the Legislature did not intend the counties to have control over those personnel provisions which have their basis in federal legislative and regulatory mandate. Ruling 11 is based upon federal legislative requisites to AFDC funding. The reasoning behind Ruling 11 is to assure that a merit system of personnel administration exists throughout the state for employees of welfare agencies. The county argues that this purpose is no longer served or necessary since the Civil Service laws would adequately comply with the federal requirements. However, this argument fails in that Civil Service is not binding upon or in effect in all counties. Somerset County is not bound by Civil Service. Thus, in the absence of *N. J. S. A.* 44:7–6 and Ruling 11, Somerset County would not be required to have a merit system of personnel administration and uniformity would not exist.

For the reasons given, I conclude that Ruling 11 still serves the purpose for which it was originally intended and that purpose is separate and distinct from the rationale behind the Charter Law.

As a general rule, where there are two statutory enactments relating to the same subject, the court must give effect to both if possible. *State v. Shoopman,* 11 *N. J.* 333, 340 (1953); *Bruck v. The Credit Corp.,* 3 *N. J.* 401, 408 (1950). Furthermore, "where the statutory provisions may reasonably stand together, each in its own particular sphere of action, there is not the repugnancy importing the design to repeal the earlier provision." *Swede v. Clifton,* 22 *N. J.* 303, 317 (1956); see *Henninger v. Bd. of Chosen Freeholders,* 3 *N. J.* 68, 71 (1949). Accordingly, Ruling 11 is

not inconsistent with *N. J. S. A.* 40:41A–26 and is a general law binding upon the county.

Further support for the conclusion that Ruling 11 remains binding upon Charter counties is found in the recent amendment to the state AFDC program. *L.* 1977, *c.* 127, amends *N. J. S. A.* 44:10–1 *et seq.* so as to substitute the term "county welfare agency" for "county welfare board." The county appears correct in its contention that such legislation was enacted in order to assure that the new requirements of the state AFDC program would be binding upon a county which had abolished its welfare board and substituted a welfare agency. However, this is only part of the effect of this act. *L.* 1977, *c.* 127, § 6, provides:

\* \* \* Whenever in any law, rule regulation or document not specifically repealed or otherwise affected by this act, reference is made to the county welfare board, the same shall mean and refer to the county welfare agency duly organized under the laws of this State.

This section must be read to change reference to "county welfare board" in *N. J. S. A.* 44:7–6 (which is applied to AFDC via *N. J. S. A.* 44:10–2) to "county welfare agency." This is an expression of the Legislature's intent not only to adopt the holding in *Amer. Fed'n of State, Cty. & Mun. Employees v. Hudson Cty. Welf. Bd., supra,* with respect to restructuring the county welfare board, but also to require that the remaining legislation with respect to AFDC be binding upon any successor agency.

■ Therefore, with "a clear legislative declaration to the contrary," the general intent and purpose of the Charter Law has been altered with respect to the personnel provisions under the state AFDC program. *N. J. S. A.* 44:7–6 and Ruling 11 are not superseded by the Charter Law and they remain binding upon the counties even after adoption of· an optional form of government.

Summary judgment is granted in favor of the plaintiff.